Irving KAS, et al., Appellants

v.

FINANCIAL GENERAL BANKSHARES, INC., et al.

No. 85–5834.

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1986.

Decided July 22, 1986.

---

Samuel P. Sporn, New York City, for appellants. Kevin R. McCarthy, Washington, D.C., entered an appearance for appellants.

Paul C. Warnke, with whom J. Griffin Lesher, Robert P. Reznick and Kathy E.

Manning, Washington, D.C., were on brief, for appellees.

Before WALD and EDWARDS, Circuit Judges, and KOZINSKI*, Circuit Judge, United States Court of Appeals for the Ninth Circuit.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Irving Kas and his daughter Helen Sonenshine appeal from the District Court's denial of their motion for class certification and dismissal of their complaint setting forth violations of the Securities Exchange Act of 1934. The alleged violations occurred in connection with a proxy statement issued by Financial General Bankshares, Inc. (Financial General). The proxy statement concerned a merger whereby Financial General became a wholly-owned subsidiary of FGB Holding Corporation, with the public shareholders of Financial General receiving cash for their shares. The District Court dismissed appellants' complaint after concluding that the facts allegedly omitted or misstated in the proxy did not render the proxy statement false or misleading. The factual background of this merger and proxy statement and the legal questions involved therein have been discussed at length in our companion opinion in *Berg v. First American Bankshares*, 796 F.2d 489 (D.C. Cir.1986). This opinion, therefore, will address only the additional facts and legal issues relevant to our conclusion that the District Court properly granted the defendants' motion to dismiss or in the alternative for summary judgment. Because of our holding, we need not consider the District Court's denial of the motion for class certification.

## I. BACKGROUND

Financial General, a registered bank holding company, originally had two classes of stock, Class A and common, with the common shares representing approxi-mately 99% of the total voting equity of the company. In the spring of 1982, FGB Holding Corporation commenced a tender offer for the common stock of Financial General. FGB Holding Corporation was a wholly-owned subsidiary of Credit and Commerce American Investment, B.V. (CCAI), a Netherlands corporation that in turn was a wholly-owned subsidiary of Credit and Commerce American Holdings, N.V. (CCAH), a Netherlands Antilles corporation. The shareholders of CCAH were a group of three Middle Eastern investors, Kamal Adham, Abdullah Darwaish, and Faisal Saud al Fulaij ("the Investors"). Through its tender offer FGB Holding Corporation obtained 96% of Financial General's common stock, which gave it 95% of the company's voting equity.

Soon after the completion of the tender offer, the board of directors of Financial General approved a merger between FGB Subsidiary, Inc. (FGB Sub), a wholly-owned subsidiary of FGB Holding Corporation, and Financial General. Under the merger agreement each Class A share of Financial General would be redeemed by $28.00 in cash, if two-thirds of the Class A shares voted to approve the cancellation of the Class A stock. Otherwise, the Class A shares would remain outstanding after the merger. Although approval of the merger itself was assured since FGB Holding Corporation owned 95% of Financial General's voting equity, the separate vote of the Class A shareholders, voting as a class, was necessary to cancel the Class A shares. Financial General's board of directors distributed a proxy statement to the Class A shareholders on July 9, 1982, and on August 11, 1982, 70.6% of the Class A shares voted to cancel the Class A stock.

After the merger, Kas and Sonenshine (hereinafter collectively referred to as Kas) filed suit alleging that the proxy statement was materially false and misleading in violation of sections 10(b) and 14(a) of the Securities Exchange Act and Rules 10b–5 and 14a–9 promulgated thereunder. *See* 15

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

U.S.C. §§ 78j(b), 78n(a); 17 C.F.R. §§ 240.-10b–5, 240.14a–9 (1985). The misrepresentations and omissions alleged in the complaint that are important for this appeal can be divided into two groups. First, the complaint alleges that the proxy statement failed fully and adequately to disclose that two directors of Financial General, Clark Clifford and Robert A. Altman, served not only as officers, directors, and legal advisors for Financial General but also as attorneys for the Investors and as attorneys, officers and directors for the Investors' various corporate vehicles, including FGB Holding Corporation. According to Kas, these dual roles of Clifford and Altman amounted to a "conflict of interest."

The second set of allegations in the complaint concerns a paragraph in the proxy statement describing how "representatives" of FGB Holding Corporation proposed to Eugene B. Casey, a director of Financial General and the holder of more than 30% of the Class A shares, that FGB Holding Corporation acquire all the Class A shares. The challenged paragraph goes on to state that FGB Holding Corporation and Casey "agreed that a price of $28.00 per Class A Share in cash would be fair." Kas argues that this discussion in the proxy statement was materially false and misleading because it failed to disclose: (1) that the "representatives" of FGB Holding Corporation were Clifford and Altman; and (2) that Casey was aged, sick and infirm and primarily motivated to liquidate his stock because "the end was getting near."

The District Court determined that Clifford and Altman faced no conflict of interest in serving on the board of directors of Financial General at the same time that they served as attorneys to the Investors. The Court based this conclusion on the fact that the $28 price obtained for the Class A shares was considered fair by both Casey and First Boston Corporation, the professional investment advisor to Financial General. *See Kas v. Financial General Bankshares, Inc.,* 617 F.Supp. 288, 290 (D.D.C. 1985). The Court also found that the proxy statement adequately disclosed Clifford's and Altman's various roles. *Id.*

With regard to the second set of allegations in the complaint, the District Court determined that any misrepresentations or omissions concerning Casey's decision to sell his Class A shares were not material. Relying on *Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1 (2d Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984), the District Court determined that "the actual subjective motivations behind a shareholder's recommendation of a transaction need not be disclosed, as long as the relevant underlying facts are disclosed." *Berg v. First American Bankshares, Inc.,* Civil Action No. 83–3887, slip op. at 6 (D.D.C. Apr. 17, 1985) [Available on WESTLAW, DCTU database]; *cf. Kas,* 617 F.Supp. at 290. As an alternative ground for dismissing the entire complaint, the District Court held that even if the alleged misrepresentations and omissions were material, Kas's claims under sections 10(b) and 14(a) must be dismissed because reliance by Kas could be neither proven nor presumed. *See Kas,* 617 F.Supp. at 291–92.

## II. ANALYSIS

### A. *The Alleged Conflict of Interest*

No factual dispute exists concerning the various positions occupied by Clark Clifford and Robert A. Altman at any time prior to the merger. Early in 1978, Clifford and Altman, members of the law firm of Clifford & Warnke, were retained as attorneys for the three Investors. The Investors sought legal representation after Financial General became aware that the three Investors together controlled over 15% of its common stock and filed a law suit against the Investors. Financial General also instituted a complaint with the Securities and Exchange Commission (SEC). *See* Clifford Deposition at 5. Clifford and Altman represented the Investors before the SEC and in the lawsuit instituted by Financial General.

Clifford and Altman, and their law firm of Clifford & Warnke, also acted as counsel to the Investors in connection with the In-

vestors' acquisition of control of Financial General. As such they were involved in incorporating the various vehicles by which the Investors made their tender offer for Financial General's common stock. *See* Altman Deposition at 5. These corporate vehicles included CCAH, CCAI and FGB Holding Corporation. Clifford and Altman were directors of all three corporations. Altman also served as secretary of CCAI and CCAH and as president of FGB Holding Corporation, while Clifford served as chairman of the board of FGB Holding Corporation.

The management of Financial General refused to support the Investors' proposed tender offer until the middle of 1980. On July 25, 1980, however, the Investors and Financial General entered into a Definitive Agreement whereby Financial General would not oppose the Investors' tender offer for Financial General's common stock. The Definitive Agreement also provided that Clifford would be elected to Financial General's board of directors as a representative of the Investors.

After the completion of the Investors' tender offer on April 14, 1982, Clifford was elected chairman of the board of Financial General and Atlman became a director. In addition, the law firm of Clifford & Warnke was retained as outside counsel to Financial General. Clifford and Altman thus served as officers and directors of Financial General at the time the plan of merger between Financial General and FGB Holding Corporation was considered and approved by Financial General's board of directors.

Kas argues on appeal that Clifford and Altman had "conflicts of interest" in representing the Investors and their various corporate entities while at the same time serving as officers and directors of Financial General. Kas also urges that the proxy statement did not fully and adequately disclose these conflicts. The defendants, on the other hand, argue that Kas's allegations amount to nothing more than a state-law claim that Clifford and Altman breached a fiduciary duty owed to Financial General's Class A stockholders. According to the defendants, such a claim must be dismissed under *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In *Santa Fe* the Supreme Court dismissed a suit under Rule 10b–5 where the plaintiff claimed only that the defendants had effectuated a short-form merger at an inadequate price and without prior notice to the minority shareholders. The Supreme Court concluded that this breach of fiduciary duty, without more, fell outside the scope of section 10(b). The defendants read *Santa Fe* to stand for the proposition that allegations of conflicts of interest do not implicate the federal securities laws. *See* Brief of Defendants-Appellees at 22–23.

This argument misreads the Supreme Court's holding in *Santa Fe.* The section 10(b) claim dismissed in *Santa Fe* presented absolutely no claim of misrepresentation or nondisclosure. The Supreme Court held only that a breach of fiduciary duty, absent any element of deception or manipulation, stated no claim under section 10(b). We do not, however, read *Santa Fe* to preclude an action under the Securities Exchange Act based on a material nondisclosure or misrepresentation simply because the undisclosed facts involved might also support a breach of fiduciary duty claim. *Santa Fe* itself declares that "the existence of a particular state-law remedy is not dispositive of the question whether Congress meant to provide a similar federal remedy" under section 10(b). *See Santa Fe,* 430 U.S. at 478, 97 S.Ct. at 1303. The defendants' overly expansive reading of *Santa Fe,* moreover, conflicts with post-*Santa Fe* case law recognizing a cause of action based on a failure to disclose that a member of management has a personal stake in a corporate decision or has some special relationship to another party to a bargain for which shareholder approval is sought. *See, e.g., SEC v. Falstaff Brewing Corp.,* 629 F.2d 62 (D.C.Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980); *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

■ *Santa Fe* requires a court to distinguish between an actionable omission or misrepresentation of a material fact and a claim solely for breach of a state-law fiduciary duty. This distinction has admittedly proven somewhat difficult to apply in practice: Though *Santa Fe* does not bar a claim related to a breach of fiduciary duty if there has been a material misrepresentation or omission, *see Goldberg v. Meridor,* 567 F.2d at 217–18, a plaintiff may not "bootstrap" a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty. *See Panter v. Marshall Field & Co.,* 646 F.2d 271, 288 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). This is true even though knowledge that an officer or director had actually breached his fiduciary duty might well satisfy the materiality requirement that the omitted or misstated fact be likely to "have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

A closer examination of the Supreme Court's reasoning in *Santa Fe* helps resolve this apparent tension. In *Santa Fe* the Court explained its reluctance to "federalize" substantial portions of the state law of corporations absent some clear indication of congressional intent and cautioned against the creation of a federal common law of fiduciary obligations. To avoid these results, liability under the federal securities laws should not turn on the resolution of essentially state-law issues. Thus, if the validity of a shareholder's claim of material misstatement or nondisclosure rests solely on a legal determination that the transaction was unfair to a minority shareholder or that an officer or director's conduct amounted to a breach of his fiduciary duty, the claim does not state a cause of action under sections 10(b) or

14(a) of the Securities Exchange Act. Similarly, where the failure to disclose involves the "true" motivations of the directors and so would require a court to probe the business judgment of the directors, *Santa Fe* holds that the claim states no cause of action under the 1934 Act. The federal securities laws do not impose any requirement that officers and directors or courts engage in public psychoanalysis about the real motives of corporate officers and directors for reaching a decision. *See Panter v. Marshall Field & Co.,* 646 F.2d at 288.

■ On the other hand, *Santa Fe* certainly does not preclude liability under sections 10(b) and 14(a) where a proxy statement fails to disclose either that a member of management has a personal stake in the corporate decision being made or that some special relationship exists between a member of management and some other party with interests adverse to the shareholders. Facts of this nature have always been considered material, and a failure to disclose such facts states a claim under the federal securities laws. *Cf. Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The violation arising from the failure to disclose such a potential conflict of interest does not turn on the failure to disclose a director's true motivations but rather stems from the failure to disclose a fact that puts the shareholder on notice of a potential impairment of the director's judgment. Whether or not the director's underlying action could give rise to liability for a breach of fiduciary duty under state law is not relevant. The information by itself is material for the shareholder to place the director's recommendation in perspective. *Cf. SEC v. Falstaff Brewing Corp.,* 629 F.2d at 74. Armed with such knowledge, a reasonable shareholder will scrutinize a director's recommendation more critically.[1]

---

1. We find no merit in defendants' contention that *Santa Fe* precludes review of a failure to disclose a potential conflict of interest except where a proxy fails to disclose facts relating to the financial condition of the company on

which the directors' business judgment is based. *See* Brief of Defendants-Appellees at 23 n. *. Such an assertion collapses in the face of cases such as *Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1, 5 (2d Cir.1983), *cert. denied,* 465

The District Court's determination in the present case that Clifford and Altman had no conflict of interest that needed to be disclosed thus reflects a misapplication of the principles of *Santa Fe*. The District Court based its determination on the fact that the price obtained for the Class A shares was considered fair by both Casey and First Boston. The fairness of the price, however, is relevant only for determining whether Clifford and Altman breached their state-law fiduciary duty to the Class A shareholders. This is precisely the sort of issue which does not state a federal cause of action under *Santa Fe* and should be left to state law. *Cf. Financial General Bankshares, Inc. v. Metzger*, 680 F.2d 768 (D.C. Cir.1982).

A determination of whether or not Clifford and Altman breached their fiduciary duty to the Class A shareholders, moreover, was not relevant to the resolution of Kas's federal securities claims.[2] The proper inquiry for the Court was whether the dual roles of Clifford and Altman were immaterial as a matter of law under the Securities Exchange Act's disclosure requirement, regardless of whether these dual roles actually amounted to a breach of any fiduciary duty owed to the Class A shareholders under state law. Materiality is a mixed question of law and fact. A complaint should not be dismissed prior to trial on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable shareholder that reasonable minds could not differ on the question of their importance. *See, e.g., Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). Case law in our own and other circuits clearly indicates that such dual roles cannot be considered immaterial as a matter of law. In *SEC v. Falstaff Brewing Corporation*, 629 F.2d at 73–75, this court found a proxy statement materially false and mis-

leading where it failed to disclose *potential* conflicts of interest. *Falstaff* involved a proxy for an amendment to the corporation's charter that would permit payment of dividends on preferred stock in common stock rather than in cash. A single individual, Kalmanovitz, had beneficial ownership of 100% of the outstanding preferred shares and also held a majority of voting control. We held that the shareholders in *Falstaff* were entitled to know that "Kalmanovitz controlled the very management that was recommending approval and soliciting the common stockholders' proxies." 629 F.2d at 75. The failure to disclose that Kalmanovitz controlled a majority of votes violated section 14(a) of the 1934 Act.

Similarly, in *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1 (2d Cir. 1983), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984), the Second Circuit noted that "[s]o long as any personal stake of any member of management is fully disclosed, the [proxy] disclosure may be limited to objective, non-misleading factual material." 722 F.2d at 5. The court found that because the proxy materials in *Data Probe* fully set forth the guarantees of employment offered by CRC Information Systems, Inc. to the officers and directors of Datatab, Inc. when CRC sought to acquire Datatab by a tender offer, the proxy statement complied with federal disclosure obligations. *See also Gould v. American-Hawaiian Steamship Company*, 535 F.2d 761, 773 (3d Cir.1976) (proxy must reveal relationship between directors and other party to the bargain); *Smallwood v. Pearl Brewing Company*, 489 F.2d 579, 604 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974) ("Certainly, it is essential that the recipients of a proxy statement know that a director's recommendation contained therein is not completely disinterested."); *cf. Valley National Bank v. Trustee for*

---

U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984), where the Second Circuit required that a proxy statement disclose certain guarantees of employment offered by an acquiring corporation to the officers and directors of a corporation being acquired through a tender offer.

2. Accordingly, those parts of Kas's federal claims based on the existence of *actual* conflicts of interest must be dismissed under *Santa Fe Industries v. Green*.

*Westgate-California Corporation,* 609 F.2d 1274, 1281–82 (9th Cir.1979), *cert. denied,* 444 U.S. 1015, 100 S.Ct. 667, 62 L.Ed.2d 790 (1980) (finding adequate disclosure of potential conflict of interest where proxy disclosed that bankruptcy trustees for Westgate who voted to approve merger with Air California were also directors of the latter corporation); *Golub v. PPD Corporation,* 576 F.2d 759 (8th Cir.1978) (proxy required to explain details of bonuses to be paid to directors of old corporation who would become employees of new corporation after sale of old corporation's assets, but not required to characterize "true" nature of bonuses as a reward for the sale of the business).

■ We conclude that the dual role of Clifford and Altman cannot as a matter of law be considered immaterial for disclosure purposes. To the contrary, the dual roles would in all probability have assumed actual significance in the deliberations of a reasonable shareholder. *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Knowledge of the various roles of Clifford and Altman would have provided a context to enable the Class A shareholders to evaluate their endorsement of the proposed plan of merger. This is so regardless of whether Clifford and Altman had a personal financial interest in the merger.

The only remaining issue concerning the dual roles of Clifford and Altman is whether the proxy statement in fact adequately disclosed these roles. The District Court found that "the proxy statement clearly disclosed the fact that Clifford and Altman were directors of the company and also directors of the companies which held 96% of the common shares and 95% of the company's combined voting power prior to the merger." 617 F.Supp. at 290.

Kas's claims of nondisclosure fade upon even a cursory examination of the proxy statement. The proxy statement clearly states that: (1) Clifford was originally elected to Financial General's board of directors in 1980 as a "representative[ ] of the Investors;" (2) Clifford was elected

chairman of the board of Financial General on April 14, 1982 at the time FGB Holding Corporation gained control of Financial General through its tender offer; and (3) Clifford was a member of the law firm of Clifford & Warnke and a director of FGB Sub, FGB Holding Corporation, CCAI and CCAH. *See* Proxy Statement at 14–15. The proxy also states that Altman was elected a director of Financial General on April 14, 1982, that Altman was a member of the firm of Clifford & Warnke, and that Altman served as a director of FGB Sub, FGB Holding Corporation, CCAI and CCAH. *See* Proxy Statement at 14. Additionally, the proxy states that:

> The law firm of Clifford & Warnke, of which Messrs. Altman and Clifford are members, was retained as outside counsel for [Financial General] on April 14, 1982. Clifford & Warnke has also acted as counsel to the Investors in connection with the acquisition of control of the Company, including the [tender] Offer and the Merger.

Proxy Statement at 16.

Kas proffers several arguments for why this disclosure is inadequate. First, Kas argues that the proxy statement presents only a "segmented and fragmented reference," Brief of Plaintiffs-Appellants at 15, to Clifford's and Altman's positions because the discussion of Altman appears on page 14 of the proxy while the discussion of Clifford appears on page 15 and the reference to the law firm of Clifford & Warnke does not appear until page 16. This contention need not detain us long. In the first place, it is factually inaccurate: The discussion of Clifford as the "representative[ ] of the Investors" heads the entire discussion of the directors which begins on page 14. Moreover, the discussion cannot be considered fragmented. The discussion of Altman and Clifford is contained within a two-page unified discussion of Financial General's ten directors. The directors are discussed in alphabetical order—hence Altman is discussed at the bottom of page 14 while Clifford is not discussed until near the top of page 15. The

discussion of the law firm of Clifford & Warnke immediately follows the alphabetical discussion of the directors. Kas's implicit suggestion that the proxy statement should have placed the discussion of Clifford, Altman, and Clifford & Warnke together would have required the proxy to "fragment" the discussion of the other directors, many of whom also served as directors of FGB Holding Corporation, CCAI and CCAH. *See* Proxy Statement at 15 (discussing James M. Gavin, Elwood R. Quesada and Stuart Symington). The discussion of the directors as a group makes plain that at least half of them had some connection to the Investors. Organization along the lines suggested by Kas would tend to obscure this important consideration.

Kas next argues that the proxy statement neglects to state that Clifford and Altman served not only as directors but also as officers of FGB Holding Corporation and FGB Sub. This argument is equally unavailing. On page 20 the proxy clearly states that Clifford and Altman were officers of FGB Sub and also refers the reader to other sections of the proxy which confirm their suggested role as officers of FGB Holding Corporation:

> Messrs. Clifford and Altman, who are directors of [Financial General] and of [FGB Holding Corporation], CCAI and CCAH, are the directors of FGB Sub. Mr. Clifford is also the President and Treasurer, and Mr. Altman is also the Vice President and Secretary, of FGB Sub. For information regarding Messrs. Clifford and Altman, see "ELECTION OF DIRECTORS" above and Annex A ("Executive Officers and Directors of the Purchaser [*i.e.*, FGB Holding Corporation], CCAI and CCAH")....

Kas argues, however, that disclosure of the "officerial" positions of Clifford and Altman in the Investors' corporations was inadequate because "buried" deep in the Annexes to the proxy statement. Although the main body of the proxy sets forth Clifford's and Atlman's role as directors of CCAI, CCAH, FGB Holding Cor-

poration and FGB Sub and as officers of both Financial General and FGB Sub—*i.e.*, the two parties to the merger—only in the Annexes does the proxy reveal that Clifford was chairman of the board of FGB Holding Corporation, *see* Annex II at 34, and that Altman was president of FGB Holding Corporation, *see* Annex I at 4; Annex II at 34, and secretary of CCAI and CCAH, *see* Annex II at 35. Although Kas cannot claim that the "officerial" roles of Clifford and Altman were not disclosed, he does contend that the disclosure was insufficient because the proxy did not fully explain Clifford's and Altman's role as officers, as opposed to merely directors, of the Investors' corporations at the time that the proxy disclosed Clifford's and Altman's other roles.

 Kas correctly points out that "[f]ull and fair disclosure cannot be achieved through piecemeal release of subsidiary facts which if stated together might provide a sufficient statement of the ultimate fact." *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir.1983). To find a disclosure inadequate under the "buried facts" doctrine, however, there must be *some* conceivable danger that the reasonable shareholder would fail to realize the correlation and overall import of the various facts interspersed throughout the proxy. In the instant case, we can find no danger that a reasonable reader would fail to correlate the merger with the Investors' control over a majority of the directors of Financial General, including Clifford and Altman. The proxy statement made it abundantly clear that Clifford and Altman had extremely close ties to the Investors. We perceive no realistic danger that a reasonable reader would underestimate the possible influence of the Investors even if the reader failed to connect Clifford's and Altman's "officerial" role with their role as directors of the Investors' corporations, a possibility we find extremely unlikely in any event given the reference to "Executive Officers and Directors of [FGB Holding Corporation], CCAI and CCAH" on page 20 of the proxy.

■ Nor can the proxy statement be faulted because it never uses the actual phrase "potential conflict of interest." The federal securities laws require only that the various roles of Clifford and Altman be clearly disclosed—as they were. *See Golub v. PPD Corporation*, 576 F.2d 759 (8th Cir.1978). The defendants need not label or editorialize on the disclosed facts, at least where the potential conflict would be obvious to any reasonable shareholder. *Cf. Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d at 5. Accordingly we affirm the District Court's dismissal of those aspects of Kas's suit based on the failure adequately to disclose potential conflicts of interest.

B. *The Allegations Concerning "Representatives" of FGB Holding Corporation*

Kas next challenges the proxy statement's depiction of discussions between "representatives" of FGB Holding Corporation and Eugene Casey concerning a fair price for the Class A shares. The challenged paragraph reads as follows: ·

On June 3, 1982, representatives of FGBHC [*i.e.*, FGB Holding Corporation] proposed to Eugene B. Casey, who holds approximately 30.5% of the outstanding Class A Shares and is the largest single holder of Class A Shares, that FGBHC acquire all of the Class A Shares as well as the [regular common] Shares in the Merger. After discussion, FGBHC and Mr. Casey agreed that a price of $28.00 per Class A Share in cash would be fair.

Proxy Statement at 8.

■ Kas argues on appeal that this statement is materially false and misleading because it fails to disclose that the "representatives of FGBHC" were Clifford and Altman, who also served as attorneys, directors, and officers of Financial General. Kas offers several theories in support of his claim that the District Court erred in concluding that the "representatives" statement omitted no material fact. First, Kas attempts to link this alleged failure to disclose to his "buried facts" argument,

challenging the failure to adequately disclose the various roles played by Clifford and Altman. This argument has some plausibility: a reasonable shareholder might well want to know that Clifford and Altman were taking an *active* role on behalf of the Investors in facilitating the merger at the same time that they served as officers and directors of Financial General. Were this the only indication of the active role played by Clifford and Altman on behalf of the Investors, therefore, the failure to identify the "representatives" of FGB Holding Corporation would clearly be a material omission. The proxy statement, however, contains many indications elsewhere that Clifford and Altman actively facilitated the merger on behalf of the Investors. For instance, the proxy statement disclosed that Clifford and Altman signed the merger agreement as officers and directors of the Investors' corporations. Since the dual roles of Clifford and Altman were disclosed in the proxy statement, we find that the additional failure to identify the "representatives" of FGB Holding Corporation who negotiated with Casey was not materially misleading as a matter of law. *See Kademian v. Ladish Co.*, 792 F.2d 614, 623 (7th Cir.1986) (materiality requires examination of the "total mix" of information available to shareholders). It is highly unlikely that a reasonable shareholder would fail to correlate the Investors' acquisition of 95% of Financial General's voting power with the plan of merger. Any reasonable shareholder would thus realize that all of the directors who approved the plan of merger served only at the Investors' sufferance and that all of the directors, not merely Clifford and Altman, were presumably acting on the Investors' behalf as well as on behalf of the Class A shareholders in facilitating the merger.

Kas next argues that Clifford and Altman had "conflicts of interest" in their dealings with Casey, since as the Investors' representatives their goal was to minimize the price paid for the Class A shares while their duty as directors and officers of Financial General was to protect the interests of the Class A shareholders. This purport-

**518**

ed "conflict of interest" does not, however, by itself make the failure to identify the "representatives" of FGB Holding Corporation materially misleading. A reader would assume that the representatives of FGB Holding Corporation had interests completely adverse to the Class A shareholders. Identifying the representatives as Clifford and Altman could only lead a Class A shareholder to believe that his interests were *more* rather than less protected, since Clifford and Altman might temper their pursuit of the Investors' interests in order to accommodate their duty to the Class A shareholders. We are frankly at a loss to comprehend Kas's argument that the failure to identify the representatives of FGB Holding Corporation had the effect of suggesting that the negotiation with Casey was an "arms-length" transaction. It seems to us that the effect of identifying Clifford and Altman would be to suggest less adversity of interests, not more, than if the "representatives" remained anonymous. A reader would not expect the "representatives" of FGB Holding Corporation to be looking out for the interests of the shareholders of the target corporation.

Kas also suggests that disclosure of the identity of the "representatives" was material because Casey greatly admired his fellow director Clifford. This argument is fundamentally flawed. In the first place, it is unclear why the revelation that the representatives of FGB Holding Corporation were none other than Clifford and Altman would alert readers to this "awe factor." More importantly, however, Kas has presented absolutely no indication that Casey's admiration for Clifford actually impaired his independent judgment on the value of the stock. *See infra* Part II.C. Without more, therefore, we cannot find that the proxy statement violated the Securities Exchange Act by failing to reveal that Casey met with Clifford. Such information would not be material to a reasonable shareholder.

C. *The Allegations Concerning Casey's Desire to Wind Up His Estate*

Kas's final challenge to the proxy statement also concerns the paragraph quoted in Part II.B, *supra*, concerning the negotiations between Casey and the "representatives" of FGB Holding Corporation. According to Kas, the proxy statement was materially false and misleading because it failed to disclose that Casey was old, sick and infirm, and motivated by a "singular desire" to wind up his affairs because he felt "the end was getting near." The District Court held that Casey's personal motives for selling were immaterial as a matter of law.

■ We need not today adopt the District Court's suggestion that a proxy statement's failure to disclose facts indicating the potentially grave impairment of an individual's judgment is legally immaterial even when the proxy statement presents that individual's valuation in support of the offering price for shares in a merger. Such a legal conclusion may well be overbroad and is certainly unnecessary for the disposition of Kas's claim. In the present case, Kas's contention that Casey's ill-health was material is based on mere speculation. At summary judgment, the defendants presented affidavits to the effect that Casey's mental activity was at all relevant times unimpaired, notwithstanding the various physical ailments from which Casey might have suffered. *See* Defendants' Statement of Material Facts as to Which There is No Genuine Issue ¶ 22 (citing Clifford Deposition at 26–29). Kas, on the other hand, has presented no facts to support his argument that Casey's judgment capacity had in any way deteriorated due to age or illness, and of course Kas can rely on no presumption that age and physical illness by themselves indicate mental impairment. When faced with defendants' motion for summary judgment Kas was required to go beyond his pleadings to show that a jury question existed on the issue of the materiality of the alleged defect in the proxy statement. *See Celotex Corporation v. Catrett*, — U.S. —, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Similarly, in support of Casey's supposed "singular desire" to wind up his affairs Kas can point to only one passage from Casey's deposition:

Q. Was it told to you by anybody at that time that your acceptance of a price for the A stock would be necessary before the arabs made a tender offer for the rest of the A stock?

A. No....

....

It's just my judgment that I had better take what was offered me and run. After all, I was getting close to the end, and I had some dispositions to make of my stock, of my estate, so that is the reason why I took it. As I said before, I had never met the arabs. I didn't know what kind of people they are.

Q. You mentioned in your previous answer that you were concerned about settling your estate? Is that a fair statement?

A. Yes.

Q. That was a factor in your thinking about accepting a price for the A stock?

A. Lots of things. I think the main thing was I was going to get some money, and I was going to distribute it around with my children.

Casey Deposition at 32–33.

Casey's personal plan for how he would use the proceeds from the sale of his Class A stock is not a material fact which would play a role in the deliberations of a reasonable shareholder. Kas has come forward with no factual support for his suggestion that Casey felt any "singular desire" to wind up his estate that might lead him to sell his stock at an unreasonable price. In the face of defendants' affidavits in support of Casey's sound business judgment,

Kas's claim cannot withstand defendants' motion for summary judgment. *See Berg v. First American Bankshares,* 796 F.2d 489, 497 (D.C.Cir.1986).[3]

### III. CLASS ACTION CERTIFICATION

Our conclusion that Kas's complaint sets forth no material misstatements or omissions which could form the predicate for liability under the Securities Exchange Act of 1934 means that we need not review the District Court's determination that this action should not be maintained as a class action. The District Court found that Kas might be subject to unique defenses not applicable to other members of the proposed class and that Kas might not adequately represent the interests of the proposed class. Even if we concluded that the District Court was in error—a subject about which we express no opinion—a remand to the District Court for further proceedings on the issue of class certification would be a futile gesture. No potential class members have any legally cognizable claim against the defendants, and Kas certainly has no interest in continuing to litigate the class certification issue where his own claims, as a matter of law, will not afford the basis for any relief to the class. The defendants, moreover, have to date argued against class certification and will not now be heard at this late date to complain of prejudice arising from the fact that the judgment against Kas will not serve as res judicata against identical claims by other shareholders. *Cf. Roberts v. American Airlines, Inc.,* 526 F.2d 757, 762–63 (7th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976) (discuss-

---

**3.** Because we affirm the District Court's determination that the proxy statement contained no material misstatements or omissions, we need not reach the District Court's alternative holding that Kas's complaint must be dismissed because reliance could be neither proven nor presumed. We do note, however, that the District Court's discussion of reliance in connection with section 14(a) and Rule 14a–9 may conflict with this court's holding in *Cowin v. Bresler,* 741 F.2d 410, 427 (D.C.Cir.1984), and the definition of materiality first set forth by the Supreme Court in *Mills v. Electric Auto-Light Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Our conclusion that the District Court correctly dismissed Kas's complaint for failure to set forth any material misstatement or omission should in no way be construed as an endorsement of its alternative rationale. We leave those complicated questions for another less pressure-ridden day.

ing waiver). Class certification at this time would provide the defendants with minimal protection in any event. They already have all the protections afforded by the doctrine of stare decisis. Given that this is a Rule 23 (b)(3) class action requiring individual notice, *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), any attempt to certify the class would most assuredly founder, since any reasonable shareholder would opt out of a class which bound him by an unfavorable judgment.[4]

### CONCLUSION

We conclude, as did the District Court, that Kas cannot sustain an action under sections 10(b) and 14(a) of the Securities Exchange Act based on any material misstatements or omissions in the proxy statement issued by Financial General. The judgment of the District Court is accordingly

*Affirmed.*

---

**4.** Having determined that Kas cannot maintain an action under sections 10(b) and 14(a) of the Securities Exchange Act of 1934, we also find that the District Court properly exercised its discretion to decline to adjudicate Kas's pendent jurisdiction claims involving common law fraud and breaches of fiduciary duty. *See Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768 (D.C.Cir.1982).