

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-27-2001

# Werner v. Werner

Precedential or Non-Precedential:

Docket 99-3715

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Werner v. Werner" (2001). *2001 Decisions*. Paper 221.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/221

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 27, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3715

ELIZABETH WERNER; JEFFREY R. ACKERMAN;
MATTHEW W. WEISS, a minor, by his parent, Elizabeth
Werner; TIMOTHY F. BURKE, JR., in his capacities as
executor of the Estate of Anne L. Werner and as trustee
of trusts created under the last will and testament of
Anne L. Werner, deceased; JEFFREY R. ACKERMAN, in
his capacity as trustee under Agreement of Trust for the
benefit of Elizabeth Werner, dated December 18, 1967;
EDWARD A. POLLACK, all of the aforementioned plaintiffs
individually and derivatively on behalf of WERNER
HOLDING CO. (PA), INC., and, individually but not
derivatively; ESTATE OF LEO L. WERNER, deceased, and
trusts created under the last will and testament of Leo L.
Werner by and through their individual beneficiaries,
Elizabeth Werner, Jeffrey Ackerman and Matthew Weiss,

Appellants

v.

ERIC J. WERNER; RICHARD L. WERNER; ROBERT I.
WERNER; DONALD M. WERNER; HOWARD L. SOLOT;
CRAIG R. WERNER; MARC L. WERNER; MICHAEL J.
SOLOT; BRUCE D. WERNER; MICHAEL E. WERNER;
BARBARA SCHWARTZ; MARSHA KARP; SHIRLEY W.
RAUCH; GAIL RAUCH BLACKMAN; GAIL RAUCH
BLACKMAN, as custodian for Heather Blackman;
HEATHER BLACKMAN; MARLENE T. KRANE; MARLENE
T. KRANE, as custodian for Jason S. Krane; JASON S.
KRANE; DEBRA A. ROTHMAN; DEBRA A. ROTHMAN, as
custodian for Kevin Matthew Rothman, for Joshua Jay
Rothman and for Jordana Rothman; KEVIN MATTHEW
ROTHMAN; JOSHUA JAY ROTHMAN; JORDANA
ROTHMAN; NOEL BERK-RAUCH; NOEL BERK-RAUCH, as

custodian for Hannah Berk-Rauch and for Eli Berk-Rauch; HANNAH BERK-RAUCH; ELI BERK-RAUCH; MINDY ALTER; MINDY ALTER, as custodian for Razie Devora Alter; RAZIE DEVORA ALTER; ELISE W. FROST; ELISE W. FROST, as custodian for Marc William Frost, for Joshua Herbert Frost and for Rachel Anne Frost; MARC WILLIAM FROST; JOSHUA HERBERT FROST; RACHEL ANNE FROST; RONALD E. WERNER; MARC L. WERNER, as custodian for Ashley Elizabeth Werner and for Jeffrey A. Werner; ASHLEY ELIZABETH WERNER; JEFFREY A. WERNER; BEVERLY WERNER RYAN; BEVERLY WERNER RYAN, as custodian for Shannon Rose Ryan and for Erin Joy Ryan; SHANNON ROSE RYAN; ERIN JOY RYAN; RONI S. ROSATI; RONI S. ROSATI, as custodian for Ryan G. Rosati and for Richmond J. Rosati; RYAN G. ROSATI; RICHMOND J. ROSATI; CRAIG R. WERNER, as custodian for Kurt J. Werner and for Kyle Werner; KURT J. WERNER; KYLE WERNER, BRUCE D. WERNER, HOWARD L. SOLOT and ERIC J. WERNER, in their capacity as Trustees for Werner Family Trust; WERNER HOLDING CO. (PA), INC., a Pennsylvania corporation,

Appellees

On Appeal From the United States District Court for the Western District of Pennsylvania
D.C. No.: 98-cv-00503
District Judge: Hon. Robert J. Cindrich

Argued: May 1, 2001

Before: MANSMANN, NYGAARD and ROSENN, Circuit Judges.

(Filed: September 27, 2001)

Richard W. Gladstone, II (Argued)
Jill M. Szafranski
Lauren E. Lindh
Eckert Seamans Cherin &
 Mellott, LLC
Pittsburgh, PA 15219

 Counsel for Appellants

James S. Larrimer
Marcus & Shapira
301 Grant Street One
Oxford Centre, 35th Floor
Pittsburgh, PA 15219

Robert E. Zimet (Argued)
Skadden Arps Slate Meagher &
 Flom LLP
Four Times Square
New York, NY 10036

Mitchell A. Karlan
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

James J. Restivo
Reed Smith Shaw & McClay LLP
435 Sixth Avenue
Pittsburgh, PA 15219

Larry K. Elliot
Cohen & Grigsby, P.C.
2900 CNG Tower
625 Liberty Avenue
Pittsburgh, PA 15222

 Counsel for Appellees

OPINION OF THE COURT

ROSENN, Circuit Judge.

The primary issue in this appeal raises important questions pertaining to the failure to disclose material corporate information as required by federal securities law in a corporation's repurchase of its capital stock. The Werner Company ("the Company"), founded by three brothers, was the largest manufacturer and marketer of ladders and other climbing products in the United States. The plaintiffs are the Anne Werner Estate, the Elizabeth Werner Trust, and other members of the Werner family and their representatives who, at all relevant times, were minority shareholders of the Company. The ten individual defendants ("the Management Defendants") are also members of the Werner family and were officers of the Werner Company at all times relevant to this action. [1]

In 1996, the Company redeemed shares held by two of the plaintiffs, the Anne Werner Estate and the Elizabeth Werner Trust, by purchase. The plaintiffs claim that, at the time of those redemptions, the Management Defendants fraudulently concealed from them material information which caused them to sell their shares at a price much lower than they would have accepted had they been fully informed.

The plaintiffs filed suit in the United States District Court for the Western District of Pennsylvania, alleging violations of Section 10(b) of the Securities Exchange Act of 1934,[2] Rule 10b-5,[3] promulgated thereunder, and numerous state laws. The District Court dismissed the twenty count complaint, as amended, in its entirety for failure to state a

_____

1. The Management Defendants have been, at all times relevant to this action, shareholders and officers of the Company. They are Richard L. Werner, Robert I. Werner, Donald M. Werner, Howard L. Solot, Craig R. Werner, Eric J. Werner, Marc L. Werner, Michael E. Werner, Michael J. Solot, and Bruce D. Werner.

2. 15 U.S.C. S 78j(b).

3. 17 C.F.R. S 240.10b-5.

claim on which relief could be granted. It also dismissed the pendent state law claims for lack of subject matter jurisdiction. The plaintiffs timely appealed only on Counts One and Two. We will affirm in part and vacate in part.

I.

To understand the issues on appeal, some background information on the Werner Company is necessary. In 1945 three brothers, R.D. Werner, Leo Werner, and Herbert Werner went into the ladder business and gave their company the family name. Over the years, the Company became extremely successful. Until November of 1997, when most of the Company was sold to a group of outside investors, all of the Company's stock was owned by members of the Werner family.

A. The Restricted Stock Plan

In 1992, the Company adopted a "Restricted Stock Plan." The proclaimed purpose of the plan was to give senior management officials an incentive to stay with the Company. It allowed the Board of Directors to award Restricted Class B Shares to certain individuals who were identified in the disclosure documents as "key employees" and "key executives." The disclosure documents did not reveal that only the ten management defendants would benefit from the Plan.

Under the Restricted Stock Plan, the recipients of the shares were not permitted to sell them until the earliest of: 1) seven years from the date of the award; 2) attainment of age 65; 3) death; or 4) permanent disability. The plan also provided the Company with a right of first refusal to acquire any awarded shares an employee wished to sell. Pursuant to that right, the Company could acquire the shares an employee wished to sell for an amount equal to the fair market value of the shares at the time of the sale minus the fair market value of the shares on the date of their award. The Plan was first disclosed to the shareholders in the 1991 Annual Report. A letter accompanying that report also alerted the shareholders to the existence of the plan, explaining its purpose and stating that it was "more restrictive and less generous" than "many

5

such plans." As of that time, no shares had yet been issued under the Plan.

In Count One of their amended complaint, the plaintiffs assert that the existence and details of the Restricted Stock Plan were not adequately disclosed to them. The District Court dismissed this claim, holding that the 1991 annual report and the letter accompanying it, as well as the annual reports for 1992-1994, provided adequate disclosure of the plan.

B. The Redemptions and the Sale of the Company in 1997

In 1996 the Anne Werner Estate and the Elizabeth Werner Trust each sought to have the Company redeem some of its shares. Plaintiff Timothy Burke, in his capacity as executor of the Anne Werner Estate, communicated with the Company about the possibility of redeeming some of the estate's stock. By a letter written by Eric Werner on December 27, 1996 ("the Redemption Letter"), the Company agreed to repurchase the stock at approximately $1000 per share, a price determined by Management Planning Inc. ("MPI"), an independent valuation firm, in its most recent appraisal of the Company's stock ("the MPI appraisal"). The MPI appraisal discounted the value of the plaintiffs' minority interests in the Company based on the assumption that the Company would continue to remain in the Werner family. The Redemption Letter disclosed that the Company "was continuing to investigate the possibility that it . . . or someone else may offer to purchase shares from one or more shareholders . . . in the future at prices which cannot be determined at this time, but which may be less than or in excess of any price you may offer or accept."

On December 30, 1996, the Anne Werner Estate sold its shares under the conditions set forth in the Redemption Letter. The Elizabeth Werner Trust sold its shares in January 1997 under the same conditions.

On October 8, 1997, the Company signed a Recapitalization Agreement with a group of outside investors known collectively as Investcorp. This agreement, which was approved by 96% of the Werner Company shareholders, amounted to a sale of most of the Company.

Under the Agreement, the Company agreed to: 1) redeem approximately 86% of the outstanding stock held by non-management shareholders and 81% of the stock held by management shareholders; 2) reclassify its remaining outstanding stock; and 3) issue additional stock to Investcorp in return for $123 million. In the redemptions following the Recapitalization Agreement, each shareholder received nearly $2500 per share redeemed.

Count One of the plaintiffs' amended complaint alleges that, at the time of the acquisitions from the Anne Werner Estate and the Elizabeth Werner Trust, the Management Defendants were seriously considering a sale of the Company and fraudulently concealed that information from the plaintiffs. They claim that this omission caused them to sell their shares at a price much lower than what they would have accepted had they been informed of the contemplated sale.

The District Court held that these allegations, as stated in the amended complaint, failed to state a claim on which relief could be granted. The crux of its holding was that the plaintiffs failed to allege that the decision to pursue a sale of the company had been made by December of 1996. Rather, the complaint alleges that, in 1996, the Board of Directors had begun to consider various "strategic alternatives," which included:

>        an initial public offering or a private placement of shares of Werner Co.'s capital stock, the incurrence of additional debt, the establishment of an employee stock ownership plan, a leveraged recapitalization or share repurchase, joint ventures with strategic or financial partners to partially divest various operations and the sale of Werner Co. or parts thereof.

(Compl. at P 133). The District Court held that the initial consideration of these strategic alternatives was immaterial as a matter of law. It stated

>        No case . . . has, to the court's knowledge, found a potential sale material to a securities transaction where, as here, the company: (1) was considering offering itself for sale; (2) was considering other alternatives to a sale; (3) had not identified a specific

7

buyer; (4) had not retained a financial advisor for the purposes of exploring a sale; and (5) had not conducted any discussions, preliminary or otherwise, with a potential buyer or buyers.

(Op. at 11). Because it believed the allegations in the complaint to be insufficient to support a finding that the alleged misrepresentations and omissions were material to the plaintiffs' decisions to sell their shares, the District Court dismissed the case for failure to state a claim on which relief could be granted.

C. The Proxy Statement

In October of 1997, the Werner Company sent a proxy statement to each shareholder explaining the details of the proposed recapitalization. The statement clearly informed shareholders that management was going to amend the Restricted Stock Plan prior to the Recapitalization to delete the right of first refusal contained therein. It did not quantify the benefit that the deletion of the right of first refusal would confer upon the management defendants. The plaintiffs asserted that this omission constituted a violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. The District Court dismissed this claim, holding the omission was immaterial as a matter of law.

II.

We begin with the portion of Count One dealing with the redemptions by the Company of the shares held by the Anne Werner Estate and the Elizabeth Werner Trust. The plaintiffs allege that the Management Defendants violated Section 10(b) and Rule 10b–5 by failing to inform them, prior to the redemptions, that the Company was considering offering itself for sale. Section 10(b) of the Securities Exchange Act makes it illegal to

use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate for the protection of investors.

8

15 U.S.C. S 78j(b). Rule 10b–5, promulgated under Section 10(b), makes it unlawful to:

> make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. S 240.10b–5(b).

The District Court dismissed Count I in its entirety, holding that the plaintiffs' amended complaint failed to allege a material misrepresentation. On appeal, in their reply brief, appellants have alleged the recent discovery of evidence consisting of Werner Company meeting minutes found in a related action in the New York Supreme Court captioned Pollack v. Bonte (New York Supreme Court Index No. 98/13606). Appellants assert that the minutes reveal a plan by the Board of Directors of the Werner Company as early as February 1996 to sell the corporation. Appellants also assert that the minutes show that the Company retained Goldman Sachs to advise the Board as to the feasibility of pursuing various financing transactions, and that Goldman Sachs greatly assisted the Board of Directors in deciding that a sale transaction was in the best interests of the Company. Appellants allege that those corporate minutes provide sufficient evidence of material misrepresentation to survive the motion to dismiss. Appellants ask this court to judicially notice the contents of the newly discovered evidence and to vacate the District Court's dismissal. In the alternative, they move in their reply brief for leave to amend their complaint to enable them to present the newly discovered evidence before the District Court.

The appellees correctly assert that, in most cases, a "court of appeals may not consider material or purported evidence which was not brought upon the record in the trial court." United States ex rel Bradshaw v. Aldredge, 432 F.2d 1248, 1259 (3d Cir. 1970). However, appeals courts may take judicial notice of filings or developments in related proceedings which take place after the judgment appealed from. See Federal Deposit Insurance Co. v. Richard A. Rubin

9

& Co., 12 F.3d 1270, 1284 (3d Cir. 1993); Landy v. Federal Deposit Insurance Co., 486 F.2d 139, 150 (3d Cir. 1973).

A court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute. See Fed. R. Evid. 201(b).4 A judicially noticed fact must either be generally known within the jurisdiction of the trial court, or be capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. See id.; see also In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 398 (3d Cir. 2000); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2nd cir. 1991); 1 Weinstein's Fed. Evid. S 201.12[1](2nd ed. 2001)("While judicial notice based on general knowledge reflects the traditional approach . . . notice of verifiable facts is a more modern development . . . consistent with the approach of the Uniform Rules of Evidence.)

We will not judicially notice the truth of the contents of the meeting minutes. The minutes were filed in a separate action involving separate parties, in a different court, in a different state. Taking judicial notice of the truth of the contents of a filing from a related action could reach, and perhaps breach, the boundaries of proper judicial notice. See United States v. Jones, 29 F.3d 1549, 1553 (11th Cir 1994)(stating that the effect of judicially noticing a fact is to preclude the opposing party from introducing contrary evidence and essentially direct a verdict against him as to the noticed fact). See also, Liberty Mutual Insurance Co. v. Rotches Pork Packers Inc., 969 F.2d 1384, 1388 (2d Cir. 1992). We will neither notice nor consider the substance of the Board minutes in adjudicating this appeal.

Judicially noticing the existence and the filing of the corporate minutes is a different matter. Appellants' counsel represent to us that subsequent to filing their opening brief,

_____

4. Fed. R. Evid. 201(b) states:

    A judicially noticed fact must be one not subject to reasonable
    dispute in that it is either (1) generally known within the
territorial
    jurisdiction of the trial court or (2) capable of accurate and
ready
    determination by resort to sources whose accuracy cannot
    reasonably be questioned.

10

they "discovered two documents produced by the Werner Company in a related action" pending in the New York Supreme Court between Pollack, an appellant herein, and the Bontes, other Company minority shareholders. They assert that the documents consist of June 13, 1997 Werner Company Board meeting minutes referring to the Board's February 27, 1996, decision "to consummate a sale transaction" and a Goldman Sachs 1996 list of Potential Financial Buyers for the Werner Company. Appellants allege that they have been denied access to these documents in this action and also in related state actions. They further assert that the June 1997 Board minutes will confirm that since 1996, Goldman Sachs had performed various valuations of the Werner Company's stock, which will conclusively prove that the Appellees "intentionally misrepresented the value of the Appellants' shares at the time of Appellants' stock redemption."

The determination of whether the Werner Company produced the meeting minutes during discovery in the New York action is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned by the Werner Company itself, or by any of the management defendants. In short, the Board meeting minutes exist, certainly were produced by the Company in the New York Supreme Court, and amply justify the late effort by appellants to amend their complaint. We can and will judicially notice the existence and filing of these minutes under Fed. R. Evid. 201(b).5

Federal Rule of Civil Procedure 15(a) states that:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . . Otherwise a party may amend

_____

5. The appellants attached a number of non-record documents to their appellate briefs, causing the appellees to move to dismiss the appeal or, in the alternative, to strike the appended material. Although there is some authority that allows a court to dismiss an appeal for improper augmentation of the record, see O'Keefe v. Sprout-Bauer, Inc., 970 F.2d 1244, 1259 (3d Cir. 1992), we decline to impose such an extreme sanction in this case because we confine the documents to the motion to amend.

11

> the party's pleading only by leave of court or by written
> consent of the adverse party; and leave shall be freely
> given when justice so requires.

(emphasis added). Rule 15 provides a flexible "basic policy statement" allowing courts freely to allow parties to amend their pleadings. 6 Wright, Miller, & Kane, Federal Practice & Procedure S 1474 (2d ed. 1990). Courts of appeals may grant a party leave to amend its compliant. See, e.g., Dunn v. Trans World Airlines, Inc., 589 F.2d 408, 412 (9th Cir. 1978) (concerning amendment to allow pleadings to conform to evidence adduced at trial under Fed. R. Civ. Proc. 15(b)); 3 Moore's Federal Practice, P 15.14[4] (1999) ("After final judgment and on appeal, amendments may be possible, but the pleader's burden increases. Subsequent leave to amend will be granted "sparingly and only if justice requires."). In the alternative, a court of appeals may remand an action with instructions to allow a party to amend a pleading. See, e.g., Moore v. Agency for Intern. Dev., 994 F.2d 874 (D.C. Cir. 1993).

In Moore, the Court remanded a pro se plaintiff 's action back to the District Court with instructions to allow the plaintiff to plead facts sufficient to meet the heightened pleading standard for Bivens actions. See Moore, 994 F.2d at 877. In Pross v. Katz, 784 F.2d 455, 459-60 (2d Cir. 1986), the Court remanded an action so that the plaintiff could amend his complaint to satisfy the heightened pleading requirement for fraud. The Court's decision to remand was based in large part on new information provided to the Court for the first time at oral argument of the appeal.

The liberal standard announced in Fed. R. Civ. Proc. 15(a) becomes less flexible after a final judgment is entered. See Harris v. City of Auburn, 27 F.3d 1284, 1287 (7th Cir. 1994) ("[A]fter judgment has been entered . .. the party making a [motion to amend a pleading] . . . had better provide the [court] with a good reason to grant his motion."); First Nat. Bank v. Continental Illinois Nat. Bank, 933 F.2d 466, 468 (7th Cir. 1991) ("[T]he presumption in favor of liberality in granting motions to amend . .. is reversed after judgment has been entered."); The Dartmouth Review v. Dartmouth College, 889 F.2d 13, 22 (1st Cir.

12

1989) ("[A]s the case passes through various litigatory stages, the pleader's burden [to obtain leave to amend] grows progressively heavier. . . . [A]mendments will sometimes be allowed, but such instances comprise the long-odds exception, not the rule."). However, in The Dartmouth Review, the Court implied that the surfacing of "some new concept" making "workable an action previously in the doldrums" was a ground for granting leave to amend during the pendency of an appeal. See The Dartmouth Review, 889 F.2d at 23 (citing Pross, 784 F.2d at 459-60).

Although we are reluctant to allow amendment of a pleading at this stage of the proceedings, the plaintiffs were precluded from engaging in discovery in the District Court. Without discovery, plaintiffs had no way to obtain the meeting minutes other than by happenstance. We will not add to the strict discovery restrictions in the Private Securities Litigation Reform Act ("PSLRA") by narrowly construing Rule 15 in this case, even at this late stage in the litigation. Given the high burdens the PSLRA placed on plaintiffs, justice and fairness require that the plaintiffs before us be allowed an opportunity to amend their complaint to include allegations relating to the newly discovered Board meeting minutes. Allowing the minutes and related evidence to be introduced in the District Court will not unduly prejudice the defendants; they have access to the minutes and they presumably know about the documents because they produced them in the first place. The Company's production supports the minutes' authenticity. Like all other evidentiary facts, any allegations in the amendment will be subject to authentication, cross-examination, and fact-finding in the District Court.

Construing plaintiffs' alternative request in their reply brief as a motion for leave to amend their Amended Complaint to aver facts consistent with recently discovered evidence, we will vacate the order of the District Court dismissing the action as to the Count I stock redemption and remand the action to the District Court with directions to allow the plaintiff to file a second amended complaint based upon the existence of the aforesaid minutes.

13

III.

We now turn to the allegations in Count One dealing with the Restricted Stock Plan. Appellants assert that they were not adequately put on notice of the Plan's adoption because the information regarding the Plan was "buried" in the various disclosure documents. The District Court dismissed this claim, holding that the Company adequately described the Plan in the 1991 annual report and the letter accompanying it. We agree.

Under the "buried facts" doctrine, a disclosure is deemed inadequate if it is presented in a way that conceals or obscures the information sought to be disclosed. The doctrine applies when the fact in question is hidden in a voluminous document or is disclosed in a piecemeal fashion which prevents a reasonable shareholder from realizing the "correlation and overall import of the various facts interspersed throughout" the document. Kas v. Financial General Bankshares, Inc., 796 F.2d 508, 516 (D.C. Cir. 1986). Having reviewed the relevant documents, we believe that the adoption and the details of the Restricted Stock Plan were adequately disclosed.

The adoption of the Plan was first revealed in a letter dated April 28, 1992, which was sent to all shareholders along with the 1991 annual report. The letter stated:

> An appropriate program to insure the retention, long-term financial reward and motivation of key executives is an important element in any business but even more critical in a family business. For several years this concern has been expressed by many shareholders and discussed by the Board of Directors. Several outside consultants have addressed this matter and the Directors authorized the establishment of a program in March 1990. The Restricted Stock Plan is designed as a "Pay for Performance" program which is keyed to future increases in the value of the Company's common stock values. The Plan is quite similar to many such plans used by listed companies but it is more restrictive and less generous.

A more detailed description of the Plan was set forth in the 1991 annual report at Note 1, entitled "subsequent events."

The relevant section of the report, which accompanied the above-quoted letter, stated:

> In March 1992, a Restricted Stock Plan was established whereby the Board of Directors may grant awards of Restricted Class B Shares to certain key employees of the Company. The Plan restricts the sale of these shares by the employee until the earlier of seven years of service from the date of the award, attainment of age 65, death, or permanent disability. If the employee terminates employment prior to the completion of the seven years of service, then such shares are forfeited.
>
> The Plan provides the Company a permanent right of first refusal to acquire any awarded shares an employee wishes to sell. The Company would acquire the shares from the employee for an amount equal to the fair market value of the shares at the time of sale less the fair market value of the shares at the date of their award. To date no awards have been granted.

In addition, each annual report from 1992 through 1994 published details concerning the Restricted Stock Plan, including the number of shares issued during the relevant time period. This information was printed in a single section entitled "NOTE D -- CAPITAL STOCK AND PER SHARE DATA."

The cases that have applied the buried facts doctrine have addressed situations where the manner of disclosure disguised or seriously distorted important information. See, e.g., Blanchette v. Providence & Worcester Co., 428 F.Supp. 347, 353 (D.Del. 1977)(prospectus stated at the outset that acceptance of the proposed tender offer would leave shareholders with "similar" voting rights, but information on the penultimate page indicated that acceptance of the offer would substantially dilute those rights); National Home Products Inc. v. Gray, 416 F.Supp. 1293, 1215–16 (D.Del. 1976)(information regarding litigation between company and its former president inadequately disclosed because it was "segmented into three different parts each presented in a different place in the documents provided shareholders"); Kohn v. American Metal Cimax, Inc., 322 F.Supp. 1331,

15

1362-63 (E.D. Pa. 1971)(200 page statement explaining proposed merger buried crucial information regarding the Directors' conflicts of interests and the investment advisors' lack of independence in appendices near the end of the document, but placed advisor's opinion that the transaction was fair on page 2 in bold-face type). Here, on the other hand, the Restricted Stock Plan was prominently addressed in a contiguous section of the letter accompanying the 1991 annual report, as well as in the report itself and in subsequent annual reports. Accordingly, we hold that the buried facts doctrine does not apply.

Appellants also assert, for the first time on appeal, that the descriptions of the Restricted Stock Plan were misleading because they describe the Plan's beneficiaries as "key executives" and "key employees" rather than disclosing that the Plan would only benefit the ten management defendants. Appellants claim that, had they known that the Plan was limited to the management defendants, they would have realized that the shares issued thereunder had been issued for less than fair consideration, giving rise to a cause of action for the wrongful dilution of their shares. These allegations do not state a claim under the federal securities laws.

Claims grounded in breach of fiduciary duty or improper management are not actionable under Section 10(b) or Rule 10b-5. See In re Craftmatic Securities Litigation, 890 F.2d 628, 638-39 (3d Cir. 1990)(citations omitted). Moreover, "a plaintiff may not `bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose the breach of fiduciary duty." Kas, 796 F.2d at 513. Accord, Lewis v. Chrysler Corp., 949 F.2d 644, 652 (3d Cir. 1991).

Appellants claim that the description of the Plan's beneficiaries that appeared in the disclosure documents was materially misleading because it failed to expose the management defendants' breach of state law duties."When the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities laws." Craftmatic, 890 F.2d at 640. Accord, Lewis, 949 F.2d at 652 (management's failure

16

to disclose self-serving motive for resisting corporate takeover was not actionable under federal securities laws). Accordingly, we dismiss this claim without prejudice to Appellants' right to file an action in the state court.

IV.

Finally, we consider the allegations Appellants put forth in Count Two of their amended complaint. This Count concerns information that the management defendants allegedly omitted from the 1997 proxy statement describing the proposed buy-out by Investcorp. The proxy statement explained that, prior to the redemption of management's Restricted Stock, the Restricted Stock Plan would be amended to delete the Company's right of first refusal. The proxy statement failed to quantify the benefit that the deletion of the right of first refusal would confer upon the management defendants.

Appellants argue that the management defendants violated Rule 10b-5 by failing to disclose in the proxy statement the amount of money that would inure to them as a result of the deletion of the right of first refusal. The District Court dismissed this claim, holding that the omission was immaterial as a matter of law. We affirm the dismissal of this Count because the shareholders had access to the information necessary to calculate the extent to which management benefitted by deleting the right of first refusal.

The right of first refusal was described in detail in the 1991 annual report. The report explained that, if a beneficiary of the Restricted Stock Plan wished to sell his or her shares, the Company had the right to repurchase the shares for an amount equal to the fair market value of the shares at the time of sale minus the fair market value on the date of their award. By deleting the right of first refusal, management was able to redeem their shares for their full value. Thus, a reasonable shareholder should have realized that management would get a higher price for their shares by deleting the right of first refusal.

Moreover, the shareholders had access to all of the information necessary to calculate the exact amount of the

17

benefit management incurred by deleting the right of first refusal. A shareholder who was interested in such information only had to look to the 1993 and 1994 annual reports to determine how many shares were issued each year pursuant to the Restricted Stock Plan.6 Using those same reports, shareholders could determine the approximate fair market value ("FMV") of Restricted shares at the date of issuance.7 Shareholders could employ the following equation to compute the amount of money the management defendants would have gotten for their shares had the right of first refusal been exercised:

[(FMV 1997 – FMV in 1993) x number of shares issued in 1993] + [(FMV 1997 – FMV 1994) x number of shares issued in 1994]

Interested shareholders could then compare the amount yielded by the above equation to the $66 million the management defendants would actually receive in the Recapitalization as proposed.

The shareholders' ability to compute the extent to which management benefitted from deleting the right of first refusal demonstrates that the omission of this information from the proxy statement was not material. See Ash, 525 F.2d at 219 (omission of exact difference between old and new pension levels in proxy was not material when proxy supplied shareholders with information necessary to perform the calculation themselves); Kahn v. Wein, 842 F.Supp. 667, 675 (E.D.N.Y. 1994)(finding no material omission in letter to shareholders when attached financial statements contained information "from which the reasonable investor could perform the simple mathematical calculations necessary to determine the present and future values of the proposed transaction to both parties"); Mesh v. Bennett, 481 F.Supp. 904, 906 (S.D.N.Y. 1979)(holding that proxy statement's failure to disclose cost of proposed

_____

6. Proxy statements need not "duplicate the financial data furnished to shareholders in the corporation's annual reports." Ash v. LFE Corp., 525 F.2d 215, 219 (3d Cir. 1975).

7. The annual reports state how many shares were repurchased by the Company each year and at what cost, allowing shareholders to calculate the cost per share.

18

modification to employee stock incentive plan was immaterial because shareholders could have computed such an estimate from the information provided). Accordingly, we will affirm dismissal of Count Two of the amended complaint.

V.

In conclusion, the District Court's dismissal of Count Two and that portion of Count One dealing with the Restricted Stock Plan will be affirmed. The District Court's order dismissing that portion of Count One dealing with the redemptions will be vacated and we will remand that portion of the complaint to the District Court with instructions to allow the plaintiffs to amend their complaint in light of the June 13, 1997 Board minutes, and for such further proceedings as are consistent with this opinion.

Costs will be taxed against the appellees.

19

NYGAARD, Circuit Judge, Dissenting in part.

I join those sections of the Majority opinion that affirm the District Court's dismissal of the Appellant's complaint. I disagree with the Majority's vacating and remanding the redemption claim.

I. Judicial Notice[1]

For the first time in this litigation, the Appellant's reply brief asserts that Werner Company corporate minutes exist, which, they allege, were uncovered during discovery in another action in New York, and, obviously, long after the District Court dismissed this cause on a 12 (b) (6) motion. I would not reverse the District Court on this basis.

First, judicially noticing these corporate minutes does nothing to change the standards and analysis the District Court used in reviewing the complaint pursuant to F ED. R. CIV. P. 12(b)(6). All the majority has by this device is the allegation that some corporate minutes were transcribed and filed by the Werner Company after a Board of Director's meeting. I can well suppose that this was done numerous times -- indeed, probably after every Board of Director's meeting. This act is irrelevant to the determination of whether the District Court properly dismissed this claim based solely upon the pleadings.[2]

Second, judicial notice is premised on the concept that certain facts exist that a court may accept as true without requiring additional proof from the opposing parties. See General Electric Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1081 (7th Cir. 1997). Put another way, judicial notice is an adjudicative device courts may use to substitute the acceptance of a universal truth for the conventional method of introducing evidence. Id . The

_____

1. Judicial notice is one of the oldest doctrines of the common law, traceable to the ancient maxim, "manifesta non indigent probatione." ("That which is known need not be proved.")

2. The Majority asserts that the plaintiffs "were precluded from engaging in discovery in the District Court." Discovery is immaterial. This is not a summary judgment. It is a FED. R. C IV. P. 12 (b) (6) dismissal, and must be decided solely on the pleadings.

20

employment of this device, therefore, demands caution, and courts should strictly adhere to the criteria established by the Federal Rules of Evidence before taking notice of pertinent facts.

Federal Rule of Evidence 201 empowers a court to take judicial notice of an adjudicative fact if that fact is "not subject to reasonable dispute." (emphasis added). The corporate minutes discovered after the case had been dismissed by the District Court are not "adjudicative facts." An adjudicative fact is one "not subject to reasonable dispute in that it is either (1) generally known . .. or (2) capable of accurate and ready determination through unquestionably reliable sources." See F ED. R. EVID. 201(b); In re Warfarin Sodium Antitrust Litigation, 214 F.3d 395, 398 (3d Cir. 2000); United States v. Carr, 25 F.3d 1194, 1202 n. 3 (3d Cir. 1994). In my view, these corporate minutes (and whatever they mean) relied on by the Majority do not fit within the criteria of Rule 201(b).

Third, before any court takes judicial notice of a fact, we should permit both parties an opportunity to be heard on the question of whether judicial notice is proper. F ED. R. EVID. 201(e). Fundamental fairness requires that before taking judicial notice of these minutes, we should have given the Appellee an opportunity to challenge the propriety of doing so. An issue raised in a reply brief and oral argument do not suffice. See eg. USA v. Damato , 554 F.2d 1371, 1373 n. 9, 10 (5th Cir. 1977). When an appellate court desires to augment the record by new evidence, not offered in the trial court, the court should afford the parties a hearing on whether judicial notice should be taken, an opportunity to examine the new evidence and comment thereon, and the opportunity to offer any new evidence to rebut the same. USA v. Doss, 564 F.2d 265, 285 n. 5 (6th Cir. 1977).

II. New Evidence Presented in a Reply Brief

Equally as troubling to me as the Majority's judicially noticing evidence discovered during the appellate process to reverse the District Court, is the fact that the issues emanating from these corporate minutes were raised for the

21

first time in the Appellant's reply brief. The Rules of Appellate Procedure contain no provision allowing for new issues to be presented on appeal, let alone in a reply brief. A reply brief is like rebuttal –- an opportunity for the appellant to "reply" to arguments of the appellee, not to raise a new issue at a time when the appellee cannot respond. That is unfair. The Rules of Civil Procedure, however, do provide a remedy specifically written for this eventuality. If a party discovers new evidence after judgment is entered, the appropriate procedure for that party is to request a stay from us, and move in the District Court for relief from its judgment under FED. R. CIV. P. 60(b). This permits a party to present new evidence while maintaining the integrity of the trial and review processes of our respective courts, and places the initial analysis of that evidence, its admissibility, and its significance, within the jurisdiction of the District Court where it belongs. Cf. Standard Oil Co. v. United States, 429 U.S. 17, 39, 97 S.Ct. 31, 50 (1976) (appellate leave not required for District Court to rule on Rule 60(b) motion).3 Rule 60(b) is the method for accommodating new concerns created by new evidence. This process, and not an expansion of the appellate court's powers, should be used when new evidence is discovered following a judgment in a district court.

Our jurisprudence is likewise clear. We stated in United States ex rel. Bradshaw v. Aldredge, 432 F.2d 1248, 1259 (3rd Cir. 1970), "It is, of course, black letter law the United States Court of Appeals may not consider material or purported evidence which was not brought upon the record in the trial court." (Emphasis added); see also Sewak v. INS, 900 F2d 667, 673 (3d Cir. 1970) ("As an appellate court we do not take testimony, hear evidence or determine disputed facts. . . ."). In this Circuit, improper augmentation of the record "is not to be condoned, and can constitute an adequate basis for dismissing an entire appeal." O'Keefe v. Sprout-Bauer, Inc., 970 F2d 1244, 1259

_____

3. Even where the application of Rule 60(b) is barred by its one-year statute of limitations, it is inappropriate for an appellate court to remand
the case to the district court to consider new evidence absent extraordinary circumstances. See Goland v. CIA , 607 F.3d 339, 370–71 (D.C. Cir. 1978).

(3d Cir. 1980). As we said in Fassett v. Delta Kappa Epsilon, 807 F.2d. 1150, 1165 (3d Cir. 1986), cert. denied, 481 U.S. 1070, 107 S. Ct. 2463, (1987), "[T]he only proper function of a court of appeals is to review the decision below on the basis of the record that was before the District Court." (emphasis added.)

## III. Conclusion

In summary, I dissent for three reasons. First, I believe the Majority's use of judicial notice is improper. Second, because this issue was raised for the first time in the Appellant's reply brief, I would not consider it. Third, the Rules of Civil Procedure specifically provide the appropriate procedural pathway, which evidently appellant's counsel failed to follow. I would affirm the District Court in all respects.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit